UNITED STATES, Plaintiff–Appellee,

v.

Arturo DE LA VEGA, Raimundo Betancourt, Ricardo Aleman, Mario Carballo and Osvaldo Coello, Defendants–Appellants.

No. 88–5166.

United States Court of Appeals, Eleventh Circuit.

Oct. 2, 1990.

Jon May, Miami, Fla., for Carballo.

Sharon Jacobs Brown, Plantation, Fla., for Coello.

Dexter W. Lehtinen, U.S. Atty., Michael P. Sullivan, Mayra R. Lichter and Linda C. Hertz, Asst. U.S. Attys., Miami, Fla., for U.S.

Before TJOFLAT, Chief Judge, CLARK, Circuit Judge, and ESCHBACH *, Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge:

This is the consolidated appeal of five individuals who, based upon their involvement in what was dubbed the "Miami River Cops Case", were convicted of various offenses under the federal racketeering, narcotics, civil rights and tax laws. On appeal, they raise numerous arguments challenging their convictions or sentences.[1] We affirm the convictions of all appellants but vacate the sentences of appellants Betancourt and De La Vega and remand them for re-sentencing.

I.

PROCEDURAL BACKGROUND

The investigation by Metro–Dade Homicide Detectives of the causes of death of three corpses found floating in the Miami River led to the discovery of a scheme by which several Miami police officers forcibly separated narcotics traffickers from their drugs or ill-gotten gains then sold or otherwise distributed the illicit products. This practice netted the officers millions in proceeds and, after a lengthy procedural passage through the criminal justice funnel, hundreds of months in prison.

Their path to prison is as interesting as it is arduous. On June 12, 1986, appellants Coello, De La Vega and Aleman were first

Fred Schwartz, Raoul G. Cantero, III, Miami, Fla., for De La Vega.

Eric M. Cohen, Coral Gables, Fla. (Court-appointed), for Betancourt. .

Milton Hirsch, Miami, Fla. (Court-appointed), for Aleman.

* Honorable Jesse E. Eschbach, Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

1. Since none of the appellants challenge the sufficiency of the evidence, we limit our recitation of the facts comprising this criminal undertaking to those helpful to the reader's understanding of the reasons for our disposition of those issues raised on appeal.

indicted along with four others for violating RICO and narcotics laws. After the return of a superseding indictment on September 4, 1986, a jury was impaneled and on September 26, 1986 their trial commenced. After nearly four months of trial and deliberation the jury was unable to achieve unanimity, and, on January 21, 1987 a mistrial was declared. The saga continued on May 7, 1987 with the return of a second superseding indictment adding additional defendants and charges of income tax evasion. On July 14, 1987 the grand jury returned its third and final superceding indictment including appellants Betancourt and Carballo and adding charges of conspiracy to murder government witnesses. Of the fifteen men charged in the indictment, only three pled not guilty and sought jury trials.[2] Appellant Aleman was tried separately in September of 1987 and convicted of violating federal narcotics and tax laws. After two-and-a-half months of trial, on February 9, 1988, appellants Carballo and Coello were found guilty by a jury of violating federal racketeering and narcotics laws.[3] The defendants now appeal asserting that the cumulative effect of a plethora of erroneous rulings denied them their right to a fair trial.

## II.

## CARBALLO AND COELLO'S APPEAL

### A. PRETRIAL PUBLICITY

#### 1. *Background*

Not surprisingly the serious charges of widespread police wrongdoing, including murder allegations, piqued the attention and concern of the public. Accordingly, the media documented this two year drama with several hundred news reports. Though largely dispassionate, these accounts were occasionally punctuated by editorial remarks. In addition, these reports were disseminated by the major audio, video and print media sources which collectively reached the entire Dade County metropolitan area. Consequently, with two exceptions, all potential jurors recalled hearing something about the case. The extent and character of the veniremen's knowledge, however, greatly varied. While during individual questioning of about eighty veniremen concerning the extent of their knowledge of the "Miami River Cops Case" approximately twenty-five potential jurors indicated that they had already formed an opinion about the guilt or innocence of the defendants, the vast majority recalled only sketchy details of facts publicized by the media. As for those ultimately impaneled as jurors, two had never heard of the case and the most the other jurors knew *collectively* was that the case involved policemen, drugs, a murder on the Miami River, and a previous trial. All impaneled jurors indicated that they had not formed an opinion regarding the guilt or innocence of the defendants and stated that they could be impartial and render a verdict based solely on the evidence admitted at trial.

#### 2. *Discussion*

■ Carballo and Coello allege that the pretrial publicity surrounding this case was so pervasive and prejudicial that the trial court's refusal to grant their motion for a change of venue or continuance deprived them of their Sixth Amendment right to trial by a fair and impartial jury. To prevail on this claim the appellants must show that they were actually prejudiced by the selection of this jury or that the factual circumstances of this case require the application of a presumption of prejudice.

##### a. Actual Prejudice

■ A finding of actual prejudice requires the appellants to demonstrate that one or more jurors entertained an opinion before the trial that the defendants were guilty and show that these jurors could not

**2.** Appellants De La Vega and Betancourt pled guilty and on appeal challenge only the trial court's compliance with sentencing procedures mandated by the federal rules of criminal procedure.

**3.** Defendant Omar Manzanilla initially pled not guilty and proceeded to trial with appellants Carballo and Coello. Midway through trial, however, Manzanilla changed his plea to guilty.

put this prejudice aside and render a verdict based solely on the evidence presented. *Irvin v. Dowd*, 366 U.S. 717, 722–23, 727, 81 S.Ct. 1639, 1642–43, 1645, 6 L.Ed.2d 751 (1961); *Cummings v. Dugger*, 862 F.2d 1504 1509–10 (11th Cir.1989). Since mere exposure to pretrial publicity and some juror knowledge of the facts and issues involved in a case is constitutionally permissible, *Irvin v. Dowd*, 366 U.S. at 722–23, 81 S.Ct. at 1642–43, and since the record in this case in no way shows any evidence of jury bias or hostility towards the defendants, we must conclude that the trial court did not commit manifest error in concluding that this jury was not actually prejudiced against the appellants. *See Cummings v. Dugger*, 862 F.2d at 1511.

### b. Presumed Prejudice

■ As no juror was actually prejudiced, relief may be granted only upon satisfaction of the presumed prejudiced standard. Jury prejudice may be presumed from pretrial publicity if the publicity is sufficiently prejudicial and inflammatory and if it saturated the community where the trial was held. *Murphy v. Florida*, 421 U.S. 794, 798–99, 95 S.Ct. 2031, 2035–36, 44 L.Ed.2d 589 (1975); *Rideau v. Louisiana*, 373 U.S. 723, 726–27, 83 S.Ct. 1417, 1644–45, 10 L.Ed.2d 663 (1963); *Cummings v. Dugger*, 862 F.2d at 1511; *Bundy v. Dugger*, 850 F.2d 1402, 1424 (11th Cir.1988); *Coleman v. Kemp*, 778 F.2d 1487, 1490 (11th Cir. 1985). This standard is reserved for extreme situations where pretrial publicity renders "virtually impossible a fair trial by an impartial jury drawn from the community." *Mayola v. Alabama*, 623 F.2d 992, 997 (5th Cir.1980) *See also, Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554, 96 S.Ct. 2791, 2800, 49 L.Ed.2d 683 (1976); *Cummings v. Dugger*, 862 F.2d at 1511; *Coleman v. Kemp*, 778 F.2d at 1490–91.

■ While acknowledging that the media coverage of the Miami River Cops investigation and trials was extensive, the publicity was not sufficiently prejudicial and inflammatory to satisfy the "extensive evidentiary showing [required] to warrant relief." *Coleman v. Kemp*, 778 F.2d at 1491. With few exceptions, the three hundred and thirty newspaper articles included in the record are largely factual in nature and could not have created the sort of inflamed community atmosphere which courts deem presumptively prejudicial. *See Rideau v. Louisiana*, 373 U.S. at 724–27, 83 S.Ct. at 1418–20, (prejudice presumed where defendant's confession to robbery, kidnapping and murder was videotaped and shown three times by television stations and broadcasts reached audiences of 24,000, 53,000 and 29,000 in a community of 150,000); *Coleman v. Kemp*, 778 F.2d at 1491–1543 (prejudice presumed from extensive pretrial publicity prejudging guilt and sentence of defendants accused of killing a family in a rural county with a population of 7,000). That the community was aware of the defendants' alleged misconduct is simply not enough to satisfy the extremely heavy burden necessary to invoke the irrebuttable presumption that no impartial and fair jury could be assembled to try these defendants. *Coleman v. Kemp*, 778 F.2d at 1537; *See also, Bundy v. Dugger*, 850 F.2d at 1425, (No presumed prejudice from extensive media coverage where poll suggested 98% of county residents were familiar with the name "Bundy", 58% knew he had been involved in an earlier case, and 31% believed that Bundy's conviction in that case strongly indicated his guilt in the present case). Accordingly, we conclude that in this case, where the relevant community contained approximately 1.8 million persons and the news reports were largely factual, the court did not err in concluding that the community was not so inflamed and biased so as to create a presumption of prejudice that a fair and impartial jury panel could not be impaneled.[4]

4. The pretrial publicity surrounding the guilty pleas entered by co-defendants Betancourt, Rojas, and De La Vega during jury selection, while relevant to our pretrial publicity analysis, does not satisfy the heavy burden associated with presumed prejudice. Additionally, the mere disappearance from counsel table of defendants Betancourt, Rojas, De La Vega and Manzanilla, particularly when coupled with the trial judge's admonition that nothing is to be inferred by their absence, does not show juror awareness of co-defendants' guilt meriting reversal.

## B. EVIDENCE OF CO–DEFENDANTS' CONVICTION

### 1. *Background*

Carballo and Coello next claim that the trial court erred in denying their motion for a mistrial after the government elicited statements from a witness that a co-defendant had been separately tried and convicted for his involvement in this case. The incident occurred during the re-direct examination of government case agent Detective Alex Alvarez by Special Assistant United States Attorney Trudi Novicki who asked,

Q. [s]econdly, what was the trial of Aleman? you were asked about Rudy Arias testifying at the trial of Aleman. What was that trial?
( ... objection ... overruled.).

A. What were the charges?

Q. Yes, what was it? What was the Aleman trial?

A. He was charged with guarding the cocaine from the Jones Boat Yard incident.

Q. He was one of the River Cops, correct?

A. Yes.

Q. Was he convicted in that trial?

Mr. Diaz: Objection, your Honor:

The Court: Well, the question has been interjected in the case. Are you suggesting—

Mr. Diaz: Reserve a motion.

Ms. Novicki: I will withdraw the question.

The Court: All right.

Mr. Diaz: Judge, I still have a motion. Now I definitely have a motion because obviously we have questions that have been asked in bad faith.

Ms. Novicki: That's not true. You have an objection.

While Detective Diaz did not actually acknowledge Aleman's conviction, three days later during Manzanilla's cross-examination of co-conspirator turned government witness Rodolfo Arias, Arias gratuitously stated that Aleman had been convicted and another objection was made and motion reserved. Two trial days later, the court denied defense counsel's motion for a mistrial based on the revelation of Aleman's conviction. Thereafter, however, the court promptly reinstructed the jury on the burden of proof, reasonable doubt, presumption of innocence and specifically informed jurors that "the fact that any other person has been convicted is not proof in and of itself of the guilt of any other person in the case."

### 2. *Discussion*

■ The admission of guilty pleas or convictions of co-defendants not subject to cross-examination is generally considered plain error. *United States v. McClain*, 823 F.2d 1457, 1465 (11th Cir.1987); *United States v. Griffin*, 778 F.2d 707, 711 (11th Cir.1985). This is so because "[i]n most occasions, the admission of a co-defendant's guilty plea will substantially affect the defendant's right to a fair trial in that 'the jury may regard the issue of the remaining defendant's guilt as settled and that the trial is a mere formality.'" *United States v. McClain*, 823 F.2d at 1465 (quoting, *United States v. Griffin* 778 F.2d at 711). "A number of our cases ... have declined to find plain error when the fact of a coconspirator's guilty plea [or conviction] was made known to the jury ..." *United States v. King*, 505 F.2d 602, 608 (5th Cir. 1974); *see United States v. Lasteed*, 832 F.2d 1240, 1243–44, (11th Cir.1987) (prompt cautionary instruction cured "inexcusable government antics" designed to reveal co-defendant's conviction); *United States v. Nickerson*, 669 F.2d 1016 (11th Cir.1982) (prompt cautionary instruction cured "blatantly improper" government question and answer informing jury that testimony of co-conspirator turned government witness brought convictions in three prior drug trials); *United States v. King*, 505 F.2d 602, (plain error not found where trial judge improperly revealed co-defendant witness's guilty plea, government's improper question and answer further highlighted co-defendant witness's plea, and no curative instruction given).

■ While it is clear that the government's solicitation of Arias's testimony con-

cerning Aleman's conviction was patently improper, after considering the facts and circumstances of this incident in its proper context, we believe that this colloquy was not so prejudicial to the defendant's interests to require a reversal and grant of a new trial. While acknowledging the seriousness of this infection, since this colloquy was certainly no more egregious than those tolerated in *United States v. Lasteed,* 832 F.2d 1240, and *United States v. Nickerson,* 669 F.2d 1016, we believe the court's curative instruction, given to the jury as soon as defense counsel's formal objection and motion for mistrial was lodged, sufficiently rendered their exposure to Aleman's conviction harmless beyond a reasonable doubt.

## C. MISCONDUCT AT TRIAL

Carballo and Coello next assert that disparaging remarks made by a government witness in response to defense questioning coupled with the trial court's "communicated disdain" for the defense and their counsel denied them their basic right to a fair trial. Since a thorough examination of the record proves the allegations of judicial misconduct to be largely fallacious, these alleged errors require only a short shrift.

■ As the function of trial attorneys is nearly as important as that of the judge, counsel is entitled to respect. *United States v. McLain,* 823 F.2d 1457, 162 (11th Cir.1987); *Zebouni v. United States,* 226 F.2d 826, 827 (5th Cir.1955). Therefore, "[t]o discredit defense counsel in front of the jury is improper, and even subsequent jury instructions aimed at rectifying this error may not ensure that these disparaging remarks have not already deprived the defendant of a fair trial." *Id.* At the same time, however, "this court is cognizant of the maxim that the trial judge has broad discretion in handling the trial and that the reviewing court should restrain itself from interposing its opinion absent a clear showing of abuse." *United States v. McLain* 823 F.2d 1457 (citing *United States v. Gomez–Rojas,* 507 F.2d 1213, 1223 (5th Cir.1975)).

■ In this case co-defendant turned government informant/witness Rodolfo Arias was indeed a loose cannon who frequently blasted defense counsel with disparaging remarks critical of both the defense bar in general and these attorneys in particular. It is important to note, however, that these remarks were not solicited by the government, but volleyed during defense cross-examination. In addition, short of imposing contempt charges, the court labored to restrain Arias and others from making unsolicited remarks, and frequently admonished the jury to disregard Arias' non-responsive answers. Accordingly, since there is no evidence of government involvement in this misconduct, since there exists no governmental duty to muzzle prosecution witnesses on cross-examination, since there are no cases requiring reversal because of disparaging remarks made by witnesses and since the trial judge labored to minimize and cure this witness's disparaging remarks, we conclude that the statements were harmless beyond a reasonable doubt.[5]

## D. REFUSAL TO EXPEDITE SENTENCING OF DEFENSE WITNESSES

■ The appellants next assert that the trial court abused its discretion in refusing to expedite the sentencing of co-defendants Estrada, De La Vega, and Rodriquez. Since these defendants previously pled guilty they obviously could not assert

5. We reject out of hand appellants' charge that "the court's tone, as well as its failure to discipline the government's witness, reflected badly on defense counsel," denying them a fair trial. A thorough review of the entire trial record clearly shows that Judge Ryskamp conducted this trial conscientiously, impartially and fairly. First, as previously stated, we believe the judge acted within his discretion in dealing with Arias. Secondly, while the judge did occasionally express impatience with the pace of the trial, no prejudicial comments were made in the presence of the jury, and the pace and schedule of this trial was well within that necessary to assure fairness. *See U.S. v. McLain,* 823 F.2d at 1459–63. Finally, the judge instructed the jury to disregard any comments he may have made during trial in arriving at their decision on the facts of the case. *See United States v. Lance,* 853 F.2d 1177, 1182 (5th Cir.1988).

broad fifth amendment privileges. While acknowledging this, the defense nonetheless asserts that their testimony would have been chilled by their pending sentencing hearings because the witnesses feared that their inculpatory testimony would be used by the judge to augment their prison terms.

Since the appellants withdrew their subpoenas, whether Judge Ryskamp's refusal to expedite the sentencing of the subpoenaed co-defendants impermissibly interfered with the appellants' rights to compulsory process was not preserved for review by this court. The law of this circuit is quite clear: a defendant waives his claim that he was denied the right to compulsory process where he does not at least subpoena the witness. *Beach v. Blackburn*, 631 F.2d 1168, 1171 (5th Cir.1980); *United States v. Bower*, 575 F.2d 499, 503 (5th Cir.1978). While the appellants did initially subpoena the witnesses in question, under these circumstances their withdrawal of the subpoenas was the functional equivalent to the failure to subpoena in the first instance. Indeed, since the withdrawal of the subpoenas denied the court the opportunity to determine if the "testimony would have been relevant and material and ... vital to the defense", *Washington v. Texas*, 388 U.S. 14, 16, 87 S.Ct. 1920, 1922, 18 L.Ed.2d 1019 (1967), any harm flowing from the court's refusal to expedite the witnesses' testimony is wholly speculative. See *Luce v. United States*, 469 U.S. 38, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984).

### E. DISMISSAL OF HISPANIC JUROR

The appellants continue their challenge of the trial judge's impartiality by asserting in Coello's brief that the judge "manipulat[ed] the jury's composition" "in excusing the only hispanic juror without sufficient inquiry to ascertain if just cause existed." While a hispanic juror was indeed dismissed, the record reveals that his dismissal was properly made after sufficient inquiry.

#### 1. *Background*

Upon return from the recess following counsels' closing arguments, Judge Ryskamp summoned all attorneys to his private robing room where he informed them that during the break his courtroom deputy was contacted by juror Estaco who sought to be excused because he was fearful of sitting on this panel. With all attorneys present, the judge had the concerned juror brought in for questioning. The judge's examination revealed that the juror, believing himself to be the sole hispanic juror on the panel, feared that he would be "blamed" by the hispanic community regardless of what verdict was returned.[6] After giving the attorneys an opportunity to pose additional questions to Estaco and after a thorough discussion with the attorneys, the court excused juror Estaco and replaced him with alternate juror Siegel.

#### 2. *Discussion*

■ Since juror Estaco was dismissed and replaced *before* the jury commenced

---

**6.** The dialogue illustrates the juror's concern.

The Court: I can't talk to you without the attorneys present, so do you just with [sic] to relay to us what your concerns are?

Juror: I was thinking if they could trade me for the extra?

The Court: And why is that?

Juror: I assume because I am the only Spanish in the whole group, and you know, whatever come out of this, my community, I may be blamed for it.

The Court: Has anybody ever said anything to you about it?

Juror: No.

The Court: Do you feel that?

Juror: I just been thinking all night about it.

The Court: Are you worried about it?

Juror: In a way I am.

The Court: Are you afraid if it should go one way or the other or either way it goes, you would get blamed? In other words, let's say you found him not guilty, are you worried about that or are you worried about if you found him guilty, are you worried about that?

Juror: I don't want to say either way I was thinking. Whatever way I thinking, I am going to vote the way I think it will be.

The Court: You haven't heard the instructions on the law yet.

Juror: No.

The Court: All right, just go back to the jury room and we will let you know.

Before you do, anybody have a question?

Mr. Diaz (Counsel for Coello): No, I don't have a question.

Mr. Killinger (for the government): No.

deliberations, Federal Rule of Criminal Procedure 24(c) governs Judge Ryskamp's decision. The rule requires alternate jurors to "replace jurors who, prior to the time that the jury retires to consider its verdict, become or are found unable or disqualified to perform their duties." Fed.R.Crim.P. 24(c). "The decision to remove a juror and replace him with an alternate is entrusted to the sound discretion of the trial judge 'whenever facts are presented which convince the trial judge that the juror's ability to perform his duty as a juror is impaired.'" *United States v. Fajardo*, 787 F.2d 1523, 1525 (11th Cir.1986); (citing *United States v. Smith*, 550 F.2d 277, 285 (5th Cir.1977)). This discretion "is not to be disturbed absent a showing of bias or prejudice to the defendant ... or to any other party." *Id.*, (quoting *United States v. Rodriguez*, 573 F.2d 330, 332 (5th Cir. 1978)). "In these instances 'prejudice' includes discharge of a juror 'without factual support or for a legally irrelevant reason.'" *Id.*, (*quoted in Green v. Zant*, 715 F.2d 551, 555–56 (11th Cir.1983)). Moreover, "[a] separate hearing on a juror's incapacity is not required where the juror's inability to continue is clear. ... 'Where the juror's disability is less certain or obvious, however, some hearing or inquiry ... is appropriate to the proper exercise of judicial discretion.'" *Id.*

Here the juror's inability to continue serving impartially was less than clear and the trial judge, in the presence of counsel in the privacy of his robing room, properly questioned the juror about his fears. In addition, counsel for both the government and the defendants were given the opportunity to question the juror and to discuss the matter with the judge before he dismissed the juror.

After reviewing the record, we believe that the judge's order dismissing juror Estaco because the juror's fear of being "blamed" by the community would impair his ability to deliberate was supported by a factual basis. Additionally, because alternate and regular jurors "were drawn in the same net, and being once drawn, were afforded the precise same treatment," *United States v. Johnson*, 657 F.2d 604, 607 (4th Cir.1981), and because the record contains no evidence supporting a claim that Judge Ryskamp sought, through this action, to manipulate the composition of the jury, replacement of this juror with alternate juror Siegel did not bias or prejudice the defendants.[7] We find, therefore, that this substitution was not an abuse of the trial judge's discretion.

## F. JUROR MISCONDUCT

Carballo and Coello further claim that a juror's introduction of extrinsic material into the jury room denied them their sixth amendment right to confront witnesses and to a fair trial.

### 1. *Background*

After appellants' trial it became known through a published media interview of jury foreman Richard Siegel that he introduced extrinsic material into the jury room during deliberation. Pursuant to an evidentiary hearing at which Siegel extensively testified, the following facts surfaced: After the first day of jury deliberation Siegel checked out from the Dade County Public Library a book entitled, "What You Need to Know for Jury Duty." Siegel read the book in its entirety and was particularly intrigued by a chapter offering suggestions on how to organize the jurors during their deliberative process. Indeed, the next day Siegel followed the book's suggestions and held an election to fill the offices of secretary, manager of the evidence, and ballot taker. About a week later Siegel brought the book into the jury and showed "some jurors" a page in the book which outlined the organizational steps which he was following.[8] Though the book then re-

---

7. Since this court denied appellant Coello's motion to supplement the record on appeal with a newspaper article appearing in the Miami Herald in February, 1988 by columnist Charles Whited, we grant the government's motion to strike the portions of appellant Coello's brief which recite portions of that article.

8. This short outline, entitled "Suggested Rules of Procedure in the Jury Room" simply proposed five simplistic steps to reach a verdict. These

mained in a drawer for Siegel's occasional reference, no other juror read the book.

### 2. *Discussion*

■ Fundamental to the administration of justice is a fair and impartial trial free from extrinsic influence and based solely upon the evidence offered at trial. *Turner v. Louisiana,* 379 U.S. 466, 472, 85 S.Ct. 546, 549, 13 L.Ed.2d 424 (1965). However, "[w]hile due process of law mandates that a fair trial be provided to the appellants, there is no constitutional right to a perfect trial." *United States v. Alvarez,* 755 F.2d 830, 859 (11th Cir.1985) (quoting *United States v. Ragsdale,* 438 F.2d 21 (5th Cir. 1971)). Mindful of this oft-quoted aphorism and cognizant that "it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote," we recognize that "[d]ue process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Smith v. Phillips,* 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982). In light of these principles we apply the test recently articulated by this court in *United States v. Rowe,* 906 F.2d 654 (11th Cir.1990), "which determines whether Sixth Amendment fair trial rights are so violated by a jury's exposure to extraneous material or influence that a new trial is warranted." See *United States v. Rowe,* 906 F.2d at 655–57.

> When jurors consider extrinsic evidence, we require a new trial if the evidence poses a *reasonable possibility of prejudice* to the defendant. Prejudice is not presumed. The defendant has the burden of demonstrating prejudice by a preponderance of credible evidence. 'Such prejudice may be shown by evidence that extrinsic factual matter tainted the jury's deliberations.' However, since it is the court's duty to ensure that the jury verdict is in no way tainted by improper outside influences, the court must investigate the asserted impropriety upon

merely a colorable showing of extrinsic influence. Subject only to Federal Rule of Evidence 606(b), the court may use whatever inquisitorial tools are necessary and appropriate to determine prejudice. If after this inquiry the court determines that the defendant met his burden of showing by a preponderance of the evidence the likelihood of jury prejudice, the burden shifts to the government to prove that the consideration of the extrinsic evidence was harmless. In recognizing the degree of prejudice required and the government's burden to establish harmless error, the strength of the government's case has a bearing on the issue of prejudicial error. Also relevant is the nature of the information learned by the jurors and the manner in which it was revealed. Finally, the standard by which we review the district court's determination of whether the defendants were prejudiced is a factual one committed to the court's 'large discretion.'

*Id.* at 656–57 (citations omitted).

Applying a "reasonable possibility of prejudice test" to the facts of a case surprisingly similar to the instant one, the Eighth Circuit found no prejudicial error. *United States v. Bassler,* 651 F.2d 600, 601–03 (8th Cir.1981). In *Bassler* a juror took notes on Roberts Rules of Order, taken from a book written about jury duty she checked out from a library. The notes were used to outline a method of procedure by which the jury could have reasonable discussions of divergent points of view and still keep the discussions orderly. Finding that these notes were "procedural" and could only have been used to "aid[ ] the jury in being conscientious and serious in attempting to deliberate in a fair and impartial manner," the Court concluded that the defendants were not sufficiently prejudiced to merit a new trial. *Id.* at 603.

After examining the extrinsic material introduced in this case in light of the judicial inquiry and the record as a whole, we

include; Get Organized, Prepare a List of Topics for Discussion, Discuss Each Item in the List for

Topics of Discussion, Debate on the Verdict, and Vote on the Verdict.

agree with the Eighth Circuit that such "procedural material" did not pose the "reasonable possibility of prejudice" necessary to warrant a new trial. The evidentiary record reveals that solely the foreman read the book, and he found it useful only in providing a structurally logical framework for jurors to examine the reams of evidence presented over the course of the two month trial. Indeed, apart from the procedural framework provided, a reading of this book reveals that its contents are largely innocuous and patently juvenile. Though, as the appellants point out, the book makes some negative references to attorneys, it basically reiterates existing stereotypes of the profession. In addition, the comments even-handedly describe all attorneys, and the author acknowledges his unfair and harsh treatment.[9] Finally, it must be stressed that the record shows that only juror Siegel actually read the book. Granted, *ex ante* this book would not be handed to jurors retiring to deliberate, but after an *ex post* examination of the book, viewed in light of the government's case, the largely innocuous quality of the procedural structure shared with all jurors, and the Eighth Circuit's judgment in a factually analogous case, we are satisfied that the trial court did not abuse its discretion in determining that the jury's exposure to this material was harmless beyond a reasonable doubt.[10]

## G. CUMULATIVE EFFECT

Having concluded that the trial court ruled correctly in all instances and that the introduction of improper statements or materials was harmless beyond a reasonable doubt, we necessarily reject the appellants'

claim that the cumulative effect of the errors at trial denied them their right to a fair trial. *See Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). While the appellants did not receive a "perfect" trial we are confident that they did receive a fair trial in accord with traditional and fundamental standards of due process. Accordingly, the convictions of appellants Coello and Carballo are AFFIRMED.

## III.

## ALEMAN'S APPEAL

### 1. *Background*

Ricardo Aleman was tried separately and convicted of violating federal narcotics and tax laws. Aleman's involvement in the Miami River Cops Case involved guarding 400 kilos of cocaine that his co-defendants had ripped off from a boat docked in the Jones Boat Yard on the Miami River. Aleman was paid $100,000 for his services which he did not report as income on his federal income tax return. On appeal, Aleman makes two arguments. First, Aleman presents a two page laundry list of twenty five alleged instances of evidentiary and other errors whose cumulative effect, he alleges, deprived him of his right to a fair trial. While this list is basically limited to alleging numerous instances of improper admission of co-conspirator testimony, limitations of cross-examination and improper prosecutorial remarks, Aleman cites only two cases and offers less than three full pages of argument to bolster these allegations. Aleman then asserts that the trial

9. "Do I sound unfair and unduly harsh on attorneys? I probably do, and admit it. But I am being so for good reason. The lawyer employs every weapon in his power because his client expects it, and has hired him expressly for that purpose. As a litigant yourself, you would demand the same aggressiveness, or be mightily disappointed." Godfrey Lehman, *What You Need to Know for Jury Duty*, p. 14.

10. The appellants further argue that the book, in addition to introducing extrinsic evidence into the jury's deliberation, impermissibly *supple-*

*mented* the court's modified Allen charge designed to break the deadlock. *See Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). Since the modified *Allen* charge was perfectly proper and we have previously determined that the book was merely used as a procedural outline in order to guide the jurors' deliberations, we conclude that the book did not add any powder to the court's *Allen*, a.k.a. "dynamite," charge. *See, United States v. Rey*, 811 F.2d 1453 (11th Cir.1987).

court reversibly erred in failing to instruct the jury on his defense theory.

### 2. *Discussion*

■ After carefully reviewing the record portions corresponding to Aleman's twenty-five item list, we conclude that the court's evidentiary rulings were correct, and the government's comments were infrequent and innocuous.[11] The evidence against Aleman was extremely strong, and, beyond any doubt, Aleman received a fair trial.

Aleman's argument concerning the court's refusal to instruct the jury on his defense theory is specious. Quite simply, Aleman denies ever having guarded cocaine and explains his receipt of the $100,000, which the evidence overwhelming proved to be either possessed or expended by him, as merely a non-taxable gift made to him by his corrupt police friends.

■ The refusal to give a requested instruction warrants reversal only if (1) the proffered instruction was substantially correct, (2) the requested instruction was not addressed in the charge actually given, and (3) the failure to give the requested instruction seriously impaired the defendant's ability to present an effective defense. *United States v. Walker*, 720 F.2d 1527, 1541 (11th Cir.1983); *United States v. Grissom*, 645 F.2d 461, 464 (5th Cir.1981).

■ Aleman asserts the court denied him a fair trial by refusing to instruct the jury that "it was not a crime to accept a gift." An examination of the record reveals, however, that the district court did not arbitrarily refuse to give Aleman's charge but instead insisted that it be reworded. After several dialogues with the court over the wording of the instruction, the court asked the defendant to prepare his final theory of defense instruction which the defendant agreed to do during the lunch hour. However, none was forthcoming.

In any case, Aleman had the opportunity to present his defense theory in closing argument, the appellant testified the money was a gift, the government expert testified that gifts are not taxable as income, and the court substantially addressed in the jury charge Aleman's defense theory by stating that for taxation purposes income does not include gifts or loans. Accordingly, since we believe that Aleman's theory was substantially covered by the jury instructions given and find that any omission was not so important as to seriously impair the appellant's ability to present a defense, we conclude that the court's refusal to give the defendant's requested instruction was not reversible error. *United States v. Sans*, 731 F.2d 1521, 1529 (11th Cir.1984). The conviction of appellant Aleman is accordingly AFFIRMED.

## IV.

## DE LA VEGA AND BETANCOURT'S APPEAL

De La Vega and Betancourt challenge the validity of their sentences because of alleged inaccuracies in their presentence investigation (PSI) reports which the trial court failed to address as required by Fed. R.Crim.P. 32(c)(3)(D). In relevant part, the rule provides that

> [i]f the comments of the defendant and his counsel or testimony or other information introduced by them allege any factual inaccuracies in the presentence investigation report ... the court shall, as to each matter controverted, make (i) a finding as to the allegation, or (ii) a determination that no such finding is necessary because the matter controverted will not be taken into account in sentencing. ...

Fed.R.Crim.P. 32(c)(3)(D).

■ Particularly where, as in this case, the defendants have pled guilty, the

---

11. The remarks made by the prosecutor, including allegations that defendant was "tripping over his own lies" and that defense tactics were "smoke screens", while improper, were not so pronounced and persistent as to permeate the entire atmosphere of the trial. *United States v. McLain*, 823 F.2d at 1462.

rule must be strictly complied with: beyond protecting the defendant from being sentenced on inaccurate information, the PSI is deemed by prison and parole officials as an accurate record of the facts of the criminal's history upon which the court relied at sentencing. *United States v. Manotas-Mejia*, 824 F.2d 360, 368 (5th Cir.1987).

The record reveals that despite De La Vega's and Betancourt's written and oral objections to numerous substantial charges contained in their lengthy pre-sentence reports, the court failed to comply with Rule 32(c)(3)(D) by making findings as to each controverted point, or, alternatively, indicate *for the record* that no finding was necessary because the disputed matter would not be taken into account.[12]

Accordingly, the sentences of De La Vega and Betancourt are vacated and remanded to the district court for resentencing in accordance with Rule 32(c)(3)(D).[13]

## V.

## CONCLUSION

For the reasons stated herein, the convictions of appellants Coello, Carballo, and Aleman are AFFIRMED. The sentences of De La Vega and Betancourt are VACATED and their cases are REMANDED for resentencing.

---

**12.** The court's offer to amend the PSI with a list of the defendant's objections is too ambiguous to constitute a finding under Rule 32. *United States v. O'Neill*, 767 F.2d 780, 787 n. 5 (11th Cir.1985)

**13.** On remand, De La Vega and Betancourt may be sentenced by the original sentencing judge.