UNITED STATES of America,
Plaintiff–Appellee,

v.

Amjad AWAN, Akbar A. Bilgrami, Sibte Hassan, Syed Aftab Hussain, Ian Howard, Defendants–Appellants.

No. 90–4114.

United States Court of Appeals, Eleventh Circuit.

July 27, 1992.

John P. Hume, Washington, D.C., for Awan.

Bennie Lazzara, Jr., Tampa, Fla., for Bilgrami.

James E. Felman, Tampa, Fla., for Hassan.

G. Richard Strafer, Miami, Fla., for Hussain.

Patrick D. Doherty, Clearwater, Fla., for Howard.

Mark Jackowski, Michael L. Rubinstein, Karla Spaulding, Asst. U.S. Attys., Tampa, Fla., for plaintiff-appellee.

Before FAY and BIRCH, Circuit Judges, and DYER, Senior Circuit Judge.

FAY, Circuit Judge:

This appeal concerns the prosecution of several international bank officers under the Money Laundering Control Act of 1986, 18 U.S.C. § 1956. Appellants Amjad Awan, Akbar Bilgrami, Sibte Hassan, Ian Howard, and Syed Aftab Hussain, formerly of the Bank of Credit and Commerce International ("BCCI"), challenge their convictions and sentences, raising a broad range of issues from alleged prejudicial pretrial publicity to juror misconduct. For the following reasons, we REVERSE the conviction of Sibte Hassan and AFFIRM the convictions and sentences of the remaining appellants.

## I. BACKGROUND

### A. *The Operation*

This case arose from an undercover operation conducted jointly by the U.S. Customs and Internal Revenue Services from 1986 to 1988. The purpose of the investigation, code-named "Operation C–Chase," was to identify as many Colombian cocaine traffickers and money launderers as possible and to effect seizure of evidence and property for prosecution. The appellants in this case were tried jointly for conspiracy, narcotic, and money laundering offenses.

In May 1986, Alvaro Uribe, a government confidential informant, met Gonzalo Mora, Jr., a leader of a money laundering ring from Medellin, Colombia. Uribe reported the contact to Emil Abreu, a U.S. Customs Special Agent based in Tampa, Florida. On July 14th in Miami, Agent Abreu, working undercover as "Emilio Dominguez," met with Gabriel Jaime "Jimmy" Mora, Gonzalo Mora's brother, and discussed the laundering of illegal drug proceeds in the United States. The next

day, Mora[1] called from Colombia and instructed Uribe to open bank accounts in Tampa.

The Florida National Bank in St. Petersburg ("FNB") and the Barnett Bank of Tampa ("Barnett") agreed to cooperate in the federal investigation. Agent Abreu opened an account in Uribe's name at each of the two banks as part of a scheme to assist Mora in his money laundering efforts. As per Mora's instructions, Uribe signed blank checks on the account and delivered them to Mora's father, Gonzalo Mora, Sr. The checks were then sent to the owners of the funds in Colombia where the checks were brokered for pesos in the black market.

In August, at a popular restaurant in the Little Havana section of Miami, Agent Abreu passed a business card with the name "Robert Musella" to Jimmy Mora. Agent Abreu explained that Musella was a businessman actively involved in money laundering. Musella, however, was the undercover identity of U.S. Customs Special Agent Robert Mazur, who would become the principal clandestine operative in the case.

By late 1986, Operation C–Chase had gained considerable momentum and hundreds of thousands of dollars had been successfully "laundered." Agent Abreu periodically picked up envelopes of cash from Mora, Sr. or Jimmy Mora and deposited the money into Uribe's accounts in increments less than $10,000 to avoid the currency transaction reporting ("CTR") requirements (a method known as "smurfing"). In various "drop cities," federal agents posing as couriers picked up suitcases of cash, funds derived from street sales of cocaine and crack, and deposited the money into American banks cooperating in the federal investigation.

In December 1986, in a meeting in Uribe's electronically monitored apartment in Tampa, Uribe introduced Mora to Agents Abreu and Mazur. Agent Mazur posed as a financial consultant representing Ameri-

can clients with legitimate funds seeking to avoid tax liability, as well as representing clients needing to launder cocaine proceeds. Agent Mazur and Mora negotiated a new method of laundering unrestricted amounts of illicit cash through American banks using front corporations. The parties agreed that Agent Mazur and his "group" would pick up drug proceeds in select American cities, deposit the money in the name of front corporations operated by Agent Mazur, send blank pre-signed checks to Mora in Colombia, and share various commission payments.

During the meeting, Mora further suggested that it would be particularly profitable if Agent Mazur could deposit money into a checking account in Panama. Checks drawn on bank accounts in Panama were worth more on the Colombian black market because of greater Panamanian bank secrecy and the physical proximity of the two countries.

In February 1987, in order to explore making deposits in Panama through an international bank, Agent Mazur opened an account at the Tampa branch of the Bank of Credit and Commerce International. Agent Mazur selected BCCI–Tampa strictly for its convenience, having seen a sign advertising BCCI's international services. Maintaining his cover, Agent Mazur met Ricardo Argudo, an officer of the bank, and explained to him that he needed the bank's services to facilitate the transfer and receipt of funds for certain South American clients who had accounts in Panama. Argudo recommended that Agent Mazur's clients open accounts at BCCI–Panama for security purposes because there was no treaty between the United States and Panama that would allow agencies of the United States to obtain banking records, unlike a recent treaty that had gone into effect with the Cayman Islands— a notorious money laundering site. After Argudo's unsolicited comments, undercover operation personnel decided to investigate

---

**1.** "Mora" refers only to Gonzalo Mora, Jr. The other members of the Mora family are referred to by their full names.

whether BCCI bankers were involved in criminal activity.

In subsequent tape-recorded conversations, Argudo told Agent Mazur that if Agent Mazur formed Panamanian corporations, BCCI need not report his transactions to the IRS. Argudo also explained CTR and suspicious transaction report filing requirements, and the currency exchange practice within the Central American black market.

In April 1987, in a meeting in Los Angeles, Agent Mazur told Mora that he had devised a system to launder money through Panama. Under the system, drug proceeds would be picked up in American cities and deposited into the accounts of Agent Mazur's cash-generating front businesses. Agent Mazur then would transfer the money to his investment account at BCCI–Tampa and, from that account, send it to BCCI–Panama, where it would be deposited into an account of IDC International, S.A. ("IDC"), a Panamanian shelf corporation Agent Mazur had acquired. Checks drawn on the IDC account would then be used to distribute the money to the owners of the drug proceeds. Meanwhile, Argudo had continued to advise Agent Mazur on the transferring of cash overseas, at one point saying, "it's the dumb people that get, get caught." [2] (GE 25B at 71).[3]

Drug proceeds tracked by Operation C–Chase were first sent through BCCI in late 1987. In October, approximately $750,000 of drug proceeds from the "Don Chepe" organization, one of the largest cocaine producing and smuggling operations in Colombia, was wired directly from FNB to BCCI–Panama. By late November, approximately $2.2 million of Don Chepe's proceeds had been wired through the IDC account at BCCI–Panama.

On November 18, 1987, Agent Mazur received an unsolicited telephone message from Syed Aftab Hussain, an operations officer at BCCI–Panama. When Agent Mazur returned his call on the 24th, Hussain told Agent Mazur that an IDC check for $110,000 could not be redeemed by the payee because of a discrepancy between the numerals and the written amount on the face of the check. He suggested that Agent Mazur call him in advance and telefax him letters of instruction authorizing payments from the IDC account to avoid further difficulties. Hussain also suggested that they meet in Miami to become better acquainted. On December 5th, at the BCCI offices on Brickell Avenue, Hussain met with Agent Mazur and discussed world-wide transfers of money, how to better secure the confidentiality of accounts, and which BCCI employees in Miami could be trusted not to "talk loose." (GE 81B at 34).

On December 9, 1987, Hussain and Agent Mazur met again and arranged a transfer of $1,185,000 from FNB to BCCI's correspondent bank in New York, and on to BCCI–Panama. Hussain instructed Agent Mazur to use a false name and not to use the account number in order to maintain secrecy. He explained that BCCI–Panama would then issue Agent Mazur a loan collateralized by a Certificate of Deposit ("CD"), but that the connection between the CD and the loan would not be reflected in BCCI's books. Instead, documents showing other collateral would be placed in the bank's records to disguise the basis for the loan. Hussain explained that law enforcement inquiries generally were directed toward checking accounts, and this system would allow the bank to avoid disclosing these records.

During their meeting, Agent Mazur showed Hussain a newspaper article detailing the murder of Raphael Salazar, a Medellin Cartel member in Colombia, and remarked that his money came "from some of the largest, big drug dealers in South America and that is something that needs

---

**2.** Ironically, an undercover operation conducted by the Drug Enforcement Administration (DEA) known as "Operation Pisces" had concluded in May 1987 with the arrest of a number of prominent Colombian drug traffickers and money launderers. The DEA seized several bank accounts into which laundered funds had been deposited, including accounts at BCCI–Panama that had been monitored by Syed Aftab Hussain, a defendant in the instant case.

**3.** "GE" refers to "Government Exhibit."

to be kept between us." (GE 85B at 48). Showing no surprise, Hussain asked in response whether the money would be placed in time deposits. Agent Mazur replied that it would be, using the loan system suggested by Hussain.

On January 11, 1988, in response to Agent Mazur's request to deal with American-based BCCI bank officers that he could trust, Hussain introduced Agent Mazur to Amjad Awan and Akbar Bilgrami, two officers who worked in the Latin American and Caribbean Regional Office ("LACRO") of BCCI on Brickell Avenue.[4] Agent Mazur informed the bankers that his clients wanted to manage new European accounts through BCCI–Panama, that he intended to deposit about $5 million a month, and that confidentiality was of extreme importance. Bilgrami and Awan explained the secrecy laws of various countries and the details of a pending treaty that would allow United States investigators access to financial records in certain European countries.

On January 25th, Bilgrami assisted Agent Mazur in opening an account at Banque de Commerce et de Placements, S.A., ("BCP–Geneva") in Switzerland, for one of Agent Mazur's Panamanian shelf corporations called Lamont Maxwell, S.A. Over the next few weeks, over $4 million in drug proceeds were transferred in separate transactions into the Switzerland bank, where CD's were purchased with corresponding loans received by Lamont Maxwell at BCCI–Panama.

On the 26th of January, in a private conversation, Agent Mazur told Awan that "the people with whom I'm dealing are the most powerful, um, and largest ... drug dealers in, in Colombia." (GE 135B at 89). Awan responded, "I want to be, uh, very clear and possibly blunt with you.... I'm not concerned ... it's not my business about who your customers are.... [W]e will provide you all security, all sorts of security and anonymity.... Further than that, I don't want to know." *Id.* at 89–90. Awan recommended that Agent Mazur limit his contacts to Bilgrami, Hussain, and himself.

In February 1988, Agent Mazur described to Awan and Bilgrami a new system for holding and transferring funds through corporations purchased by his attorneys in France, Switzerland, Great Britain, and Luxembourg. In early May, in response to a planned trip to Europe, Awan and Bilgrami briefed Agent Mazur about who would be safe to contact in London and Paris and advised him not to tell Swiss bankers the nature of his business. Awan told Agent Mazur that he always tried to refer him to "such people that ... you will be able to communicate with much easier. Of course, there's no need of telling anything more.... [T]hey will understand the situation and they'll handle it accordingly.... which is why I referred you to Chinoy and Howard in Paris and Baakza in London." (GE 282B at 40).

On May 20th, Agents Mazur and Abreu, and two female agents posing as their fiances, traveled to the BCCI–Paris office and met Nazir Chinoy, a BCCI regional manager, Ian Howard, the BCCI–Paris branch manager, and Sibte Hassan, a BCCI regional marketing officer. Under the bank officer's assistance, the agents opened three corporate accounts, depositing U.S. Treasury funds for undercover use into two accounts for purported personal use and transferring $1 million of drug proceeds from BCP–Geneva into a third account. In separate private meetings, Agent Mazur told Chinoy that his clients were "drug dealers in Colombia," (GE 283B at 72), and told Howard that he could not

---

**4.** LACRO served as an administrative, supervisory, and marketing office for the Latin American and Caribbean region. Its function was to coordinate the actions of branches, subsidiaries, and affiliates within the region and to solicit new accounts. LACRO could not, however, accept deposits directly or unilaterally approve new customers. Awan and Bilgrami were "External Marketplace" or "EMP" officers. The EMP program was designed to help clients deposit funds in countries other than those where the clients lived or where the funds originated. Clients often deposited their money abroad because of domestic currency controls or political instability.

afford having "drug investigators" looking into his business.[5] (GE 297B at 19).

On May 25th, in a brief hallway meeting, Agent Abreu introduced Mora to Hassan at the BCCI–Paris office, stating that "[t]his is a very, very sensitive matter, these people handles [sic] a lot of money from proceeds from narcotics ... especially from cocaine." (GE 298B at 1–2). Hassan, however, did not subsequently transact business for Mora, nor is it evident that Hassan was aware that Mora had any connection to Agent Mazur or his accounts.

Upon his return from Europe, Agent Mazur met with Bilgrami on June 6, 1988 at LACRO and told him about his meetings with Chinoy, Howard, Hassan, and Asif Baakza, a London-based BCCI officer.[6] Bilgrami expressed concern that so many banking sites were involved, from Geneva to London to Luxembourg to Paris to Panama, and recommended that Agent Mazur centralize service in one place. During the meeting, Agent Mazur remarked that his clients were cocaine traffickers, and Bilgrami responded by noting that "[w]e know your business." (GE 312B at 43).

Agent Mazur and Bilgrami then reviewed the details of "a new [money laundering] system that will not be touched by the old one," (GE 312B at 64), made possible by Agent Mazur's acquisition of several shelf corporations. The new system would transfer drug proceeds picked up in American cities from FNB to a new account at BCCI Luxembourg. From there, the funds would be forwarded to CD accounts in Miami, London, or Switzerland. Loans secured by the CD could then be generated from any BCCI branch to any of Agent Mazur's shelf corporations that might have accounts in Nassau, Paris, or Uruguay. A series of multimillion dollar transactions were subsequently transferred using the new system.

On June 30, 1988, Awan and Bilgrami informed Agent Mazur that they planned to leave BCCI to join a financial services company known as "CAPCOM," and had hoped to gain Agent Mazur's business. They explained that private investment houses were not watched as carefully as banks and that their power to make decisions within BCCI was eroding. On August 17th, Bilgrami suggested that Agent Mazur test the company's system by sending $500,000 through CAPCOM. Agent Mazur agreed and opened an account at CAPCOM.

On September 1st, at an apartment in Key Biscayne, Florida, Mora met with Agent Mazur and expressed concern about continuing to launder drug proceeds on behalf of Don Chepe, explaining that if Don Chepe suspected that Agent Mazur was in with "the law," "they will blow ... my head off." (GE 496B at 78). Mora noted that loyalty was the issue with Don Chepe and not money, "[i]n other words, it's Italian style. In Colombia ... we're talking about [1950's] Italian style.... We're talking about the Godfather." *Id.* at 80.

A week later, on September 9th, Awan met with Agent Mazur at the Grand Bay Hotel in Coconut Grove and told him that

---

**5.** Mora met with Agent Mazur in Paris on May 23, 1988, and introduced him to Rudolf Armbrecht, a representative of Don Chepe who had come to France to meet with Agent Mazur to discuss Agent Mazur's handling of Don Chepe's drug money. During the meeting, Agent Mazur described his various businesses, his relationship with BCCI, and a new account he had opened entitled "Nicesea Shipping, Ltd.," designed to channel new drug proceeds from Don Chepe. Armbrecht expressed concern about the laundering "mechanism" because "the amount of money that we can generate and remove is quite considerable." (GE 286B at 6). As Don Chepe's representative, Armbrecht met with undercover federal agents on several more occasions until his arrest.

Armbrecht was tried jointly with the other defendants named in this appeal. On July 29, 1990, he was convicted of Counts 2, 11–14, and 26–29 of the second superseding indictment. On November 30, 1990, he was sentenced to 60 months imprisonment on Count 2 and 151 concurrent months on each of the remaining counts, plus a three year term of supervised release and a fine of $200,000. His subsequent appeal was dismissed on January 7, 1992.

**6.** Awan had referred Agent Mazur to Baakza, the manager of BCCI's Corporate Unit in London. On May 27, 1988, just prior to his return to the United States, Agent Mazur met Baakza in London to discuss opening new accounts and informed him that his clients were drug dealers. Baakza was a charged conspirator in this case.

the United States Senate Foreign Relations Committee had begun an investigation into the money laundering activities of BCCI, and that he had been subpoenaed because he had managed Panamanian General Manuel Noriega's accounts in Panama City.[7] Awan advised Agent Mazur that he should close all corporate accounts in Panama because subpoenas likely would be issued for the records of those accounts. Awan also notified Agent Mazur that he was being immediately transferred to Paris.

In mid September, Agent Mazur made his second and last trip to Europe. On the 19th, in London, he met S.Z.A. Akbar, the president of CAPCOM. Akbar told Agent Mazur that he was a former BCCI employee but he did not want to know the nature of Agent Mazur's clients' business. Despite Akbar's request, Agent Mazur boasted about how professional his clients were, and that "[i]f [his clients] were in a room with Lee Iaccoca, you would think that they were on the board of ... Chrysler. The only difference is that Lee Iaccoca sells cars in the U.S. and these guys sell cocaine...." (GE 543B at 32).

Agent Mazur then travelled to France, where he telephoned Hussain in Panama and requested that he transfer $25,000 in drug proceeds from the IDC account in Panama to the CAPCOM account in London. Then, in separate meetings, Agent Mazur met with Chinoy, Howard, and Hassan to review bank records and recently opened accounts. While reviewing his records with Hassan, Agent Mazur prepared a letter of instruction to Hussain confirming the $25,000 transfer and asked Hassan to telefax the letter to Panama. Hassan complied with the request.

Upon his return to the United States, Agent Mazur learned from Bilgrami that Awan had resigned from BCCI, and that Akbar had been agitated about Agent Mazur's loose comments about drug trafficking. When Agent Mazur complained to

Bilgrami that his conversation with Akbar had not remained private, Bilgrami replied, "[w]e are the same group.... We're one in the same." (GE 560B at 25).

Operation C–Chase ended on the night of October 8, 1988. U.S. Customs Special Agent Kathleen Ertz, posing undercover as Agent Mazur's fiance, "Kathleen Erickson," had invited the defendants and their families to a staged wedding at the Innisbrook Resort and Golf Club in Tarpon Springs, Florida. During the bachelor party, undercover federal law enforcement personnel arrested Awan, Bilgrami, Hassan, Howard, Hussain, and Mora.

### B. *The Indictment and Trial*

On October 4, 1988, a federal grand jury in Tampa, Florida returned a sealed indictment naming ten individuals and four corporations with various narcotics, money laundering, and conspiracy offenses. A first superseding indictment naming the same number of defendants was returned two days later. After extensive pretrial litigation over that indictment, the grand jury returned a second superseding indictment on May 4, 1989. This indictment added five new defendants and additional charges.

Count 1 of the second superseding indictment charged all the defendants with conspiring to possess with intent to distribute cocaine and marijuana in violation of 21 U.S.C. § 846. Count 2 charged all the defendants with a second conspiracy under 18 U.S.C. § 371, the goals of which were to defraud the IRS of its ability to collect income taxes and data on currency transactions, and to commit money laundering offenses in violation of 18 U.S.C. § 1956. Counts 3 through 18–1[8] charged various defendants with substantive "financial transaction" violations under 18 U.S.C. § 1956(a)(1), while Counts 18–2 through 33 charged various defendants with corre-

---

**7.** Awan mockingly noted that he had yet to be served with the subpoena because the process server had instead served an innocent aerospace engineer that had Awan's same name. (GE 508B at 5).

**8.** Due to a scrivener's error, two counts of the indictment were numbered as Count 18. Rather than renumbering the entire indictment, the district court referred to the counts as Counts 18–1 and 18–2.

sponding "transportation" violations under 18 U.S.C. § 1956(a)(2).

The defendants filed a series of lengthy pre-trial motions seeking to dismiss the indictment on four grounds: (1) Counts 2 to 33 failed to state offenses; (2) Counts 3 to 18–1 and 18–2 to 33 were multiplicitous; (3) each section 1956 count was duplicitous; and (4) subsections (a)(1)(B) and (a)(2)(B) of section 1956 were unconstitutionally vague and overbroad as applied. After careful consideration, the district court denied all the motions.[9]

The defendants were tried over a six-month period from January 26, 1990 to July 29, 1990. With the exception of Hassan, the jury found the defendants guilty on all remaining counts.[10] The jury found Hassan guilty on Counts 2, 16, 31, and 33, but not guilty on Counts 11, 18–1, and 26. The defendants were sentenced on November 30, 1990.[11]

---

9. The district court did, however, strike as surplusage a portion of Count 2 that charged "conspiracy to attempt." R14:604–17–18.

10. At the close of the government's case, the district court entered a judgment of acquittal on Count 1 as to all defendants.

11. Awan and Bilgrami were sentenced to 144 months of imprisonment, with Awan receiving an additional fine of $100,000. Awan and Bilgrami also received a three-year period of supervised release upon release from confinement. R159:181.

Hussain was sentenced to 87 months, and Howard to 57 months, each with a supervised release term of three years upon release from confinement. *Id.* at 181–83. Hassan was sentenced to 37 months, with a similar supervised release term. *Id.* at 183.

12. At the time of the offenses, 18 U.S.C. § 1956, read in pertinent part:

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such financial transaction which in fact involves the proceeds of specified unlawful activity—

(A) with the intent to promote the carrying on of specified unlawful activity; or

(B) knowing that the transaction is designed in whole or in part—

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of unspecified unlawful activity; or

## II. DISCUSSION

The Money Laundering Control Act of 1986 ("the Act"), 18 U.S.C. § 1956, prohibits the knowing and willful participation in any type of financial transaction involving unlawful proceeds when the transaction is designed to conceal or disguise the source of the funds.[12] This case presents the first time that an international bank and its employees were prosecuted under the statute. Prior to the passage of the Act, there was no federal statute that made money laundering a crime. *See United States v. Popkin*, 943 F.2d 1535, 1538 n. 1 (11th Cir. 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1760, 118 L.Ed.2d 423 (1992).

The appellants have raised multiple issues for review. We address the principal issues beginning with the constitutionality of the Act as applied and concluding with an assessment of the sufficiency of the evidence regarding the conviction of Sibte

(ii) to avoid a transaction reporting requirement under State or Federal law,

shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

(2) Whoever transports or attempts to transport a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—

(A) with the intent to promote the carrying on of specified unlawful activity; or

(B) knowing that the monetary instrument or funds involved in the transportation represent the proceeds of some form of unlawful activity and knowing that such transportation is designed in whole or in part—

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

(ii) to avoid a transaction reporting requirement under State or Federal law,

shall be sentenced to a fine of $500,000 or twice the value of the monetary instrument or funds involved in the transportation, whichever is greater, or imprisonment for not more than twenty years, or both.

Money Laundering Control Act of 1986, Pub.L. No. 99–570, § 1352, 100 Stat. 3207–18 (current version at 18 U.S.C.A. § 1956 (West Supp.1992)).

Citations to sections of the Act in the opinion are to the preamended 1986 version.

Hassan. As this is an appeal from a final decision of the district court in a criminal case that includes challenges to sentences imposed by the district court, we have jurisdiction pursuant to 28 U.S.C. §§ 1291, 1294, and 18 U.S.C. § 3742. We note the appropriate standard of review in the discussion of each issue.

### A. *Void for Vagueness*

The appellants contend that 18 U.S.C. § 1956 was impermissibly vague and therefore violated their right to due process under the Fifth Amendment. The government responds that the Act provided adequate notice to the appellants that their conduct was prohibited. As the appellants' challenge does not involve the First Amendment, we review the statute as it was applied in the instant case. *Maynard v. Cartwright,* 486 U.S. 356, 361, 108 S.Ct. 1853, 1855–56, 100 L.Ed.2d 372 (1988) ("Vagueness challenges to statutes not threatening First Amendment interests are examined in light of the facts of the case at hand...."). Our review is *de novo. See United States v. Hooshmand,* 931 F.2d 725, 737 (11th Cir.1991).

In evaluating a vagueness challenge, we apply the two-part standard set forth in *Kolander v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983), which "requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." The second part is the more important aspect of the void-for-vagueness doctrine, as it is designed to bar criminal statutes "of such a standardless sweep [that it] allows policemen, prosecutors, and juries to pursue their personal predilections." *Smith v. Goguen,* 415 U.S. 566, 575, 94 S.Ct. 1242, 1248, 39 L.Ed.2d 605 (1974).

The appellants first contend that the prohibition in subsection 1956(a)(2)(B) against a defendant acting with knowledge that proceeds involved in a transportation from "some form of unlawful activity" was too vague to give notice of the type of funds that cannot be legally transported. Section 1956(c)(1), however, defined "proceeds of some form of unlawful activity" as proceeds from the commission of acts constituting any state or federal felony.[13] We note first that such felony laws obviously included all those prohibiting drug trafficking. Second, incorporation of state or federal laws into the money laundering statute is not impermissibly vague. *See, e.g., United States v. Tripp,* 782 F.2d 38, 42 (6th Cir.) (upholding incorporation of state law for purposes of defining illegal conduct in federal RICO statute), *cert. denied,* 475 U.S. 1128, 106 S.Ct. 1656, 90 L.Ed.2d 199 (1986). Third, the requirement that the government prove that a defendant *knew* that the proceeds stemmed from felonious activity "do[es] much to destroy any force in the argument that application of the [statute] would be so unfair that it must be held invalid," *United States v. Jackson,* 935 F.2d 832, 839 (7th Cir.1991) (quoting *Boyce Motor Lines v. United States,* 342 U.S. 337, 342, 72 S.Ct. 329, 331–32, 96 L.Ed. 367 (1952)), "especially with regard to the adequacy of notice to the complainant that his conduct is proscribed." *Id.* (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 499, 102 S.Ct. 1186, 1193–94, 71 L.Ed.2d 362 (1982)).

The appellants next contend that sections 1956(a)(1)(B) and 1956(a)(2)(B) were unconstitutionally vague because it prohibited a person from transporting funds "knowing that" the transaction "is designed" in whole or in part to conceal or disguise the nature of the proceeds or to avoid a transaction reporting requirement under state or federal law. They assert that the statute was unclear because it did

13. 18 U.S.C. § 1956(c)(1) stated:
[T]he term "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity" means that the person knew the property

involved in the transaction represented proceeds from some form, though not necessarily which form, of activity that constitutes a felony under State or Federal law....

not identify who had to "design" the unlawful transportation and it allowed the transfer of a third-party's criminal intent to a defendant. We agree with Judge Marcus' well reasoned resolution to this argument in an analogous case:

Th[e] contention is without merit. The application of the statute has nothing to do with the concept of "transferred intent." The Defendant suggests that the statute allows for a defendant to be convicted based on a mere assertion that someone—not necessarily the defendant—designed the transportation to avoid a transaction reporting requirement. However, in order to be guilty under the statute, a defendant *must* have knowledge that the currency or monetary instruments derive from illegal activity and that the transportation is designed to avoid a transaction reporting requirement. This knowledge must be personal to the defendant. There is no way in which a defendant may be convicted of a substantive violation of the statute based solely upon the intent of another person. Even if someone other than the defendant were to have designed the transportation to avoid a transaction requirement, the defendant still must manifest the intent to accomplish the physical transportation of the currency. In short, we fail to see what relevance the concept of transferred intent has to the operation of this statute.

United States v. Ortiz, 738 F.Supp. 1394, 1401 (S.D.Fla.1990) (emphasis in original) (defendant indicted under 18 U.S.C. § 1956 for transporting illegal drug proceeds).

Nor do we find merit in the appellants' remaining assertions that the Act as applied was impermissibly vague. The appellants claim that the statute: (1) created strict liability offenses, and (2) prohibited the avoidance of a transaction reporting requirement even where no such duty existed. First, subsections 1956(a)(1) and 1956(a)(2) plainly required proof of scienter. See Jackson, 935 F.2d at 839 (Requirements of intent and knowledge preclude

void-for-vagueness challenge.). Second, the appellants were not prosecuted for simply "avoiding" transaction reporting requirements but rather for knowingly participating in a money laundering scheme designed to avoid reporting requirements.

Accordingly, we find the money laundering statute as applied sufficiently definite to survive the appellants' void-for-vagueness challenge.

B. *"Severance" of the Kalish/Weisner Conspiracy and Admissibility of Evidence Relating to Manuel Noriega*

The appellants claim that they were unduly prejudiced because the district court failed to timely "sever" allegations concerning two other conspiracies that were raised for the first time in the second superseding indictment. The first of these two conspiracies concerned the activities of unindicted co-conspirator Steven Michael Kalish and his alleged conspiracy with Manuel Noriega to import and distribute millions of pounds of marijuana into the United States and to launder the proceeds into various financial institutions within Panama. The indictment asserted that this conspiracy occurred between June 1983 and July 1984, and during that period Kalish met with Awan on three separate occasions.[14] The second conspiracy noted in the indictment involved Jaime Weisner, another unindicted co-conspirator, who allegedly "operated a major marijuana importation, supply, and distribution network" from June 1983 to December 1987. R7:358–1. The indictment asserted that on three occasions Weisner met a banker named Surjeet Singh, who in turn met with Kalish and Awan.

The defendants contended in pretrial motions that the allegations concerning these two conspiracies were wholly unrelated to the offenses alleged in the first superseding indictment and that they were "improperly joined" as a single conspiracy under Fed.R.Crim.P. 8(b), and moved to "sever" those allegations from Counts I and II pursuant to Fed.R.Crim.P. 14. The defendants

14. The Kalish conspiracy is set forth in the first seventeen overt acts of Count I and II of the second superseding indictment. R7:358–15–17, 53.

also moved in limine to exclude any evidence concerning Noriega because its prejudicial effect would outweigh any probative value. R15:641–3. Shortly after the motions were filed, the United States unexpectedly invaded Panama, dramatically increasing publicity about Noriega's alleged involvement in drug running. The district court denied the motion in limine and the motion to sever without prejudice. R18:748. After the conclusion of the government's case, however, the district court, upon the defendants' renewed motion, held that the Kalish and Weisner dealings with BCCI were "separate and distinct conspiracies" from the undercover agents' activities with BCCI, and struck the allegations concerning Kalish and Weisner from the indictment to avoid possible prejudice to the defendants. R127:159–65; R134:117–20. The defendants now assert on appeal that the district court's belated "severance," five months into the trial, permitted numerous references to Kalish, Weisner, and Noriega before the jury, thus causing irreparable prejudice.

We review the rulings of the district court for abuse of discretion. *United States v. Russell*, 703 F.2d 1243, 1249 (11th Cir.1983) (admission of evidence); *United States v. Bullock*, 451 F.2d 884, 888 (5th Cir.1971) (striking surplusage). Because the jury was unaware of the language stricken from the indictment and no evidence concerning Kalish, Weisner, or Noriega was admitted except that which was inextricably intertwined with the evidence of charges that were presented to the jury for decision, we find that the appellants were not unduly prejudiced by the procedure followed by the district court.

█ First, the appellants mistakenly characterize their argument that the indictment's reference to Kalish and Weisner were improper as a severance argument. Severance applies only to counts or parties that are improperly joined. Fed.R.Crim.P. 8, 14. The appellants did not seek to sever whole counts, rather they complained only

of certain allegations within Counts I and II. The proper analysis must focus on whether the allegations concerning Kalish and Weisner were surplusage and, if so, whether "the allegedly excessive language was irrelevant, inflammatory and prejudicial." *Bullock*, 451 F.2d at 888.

█ A motion to strike surplusage from an indictment should not be granted "unless it is clear that the allegations are not relevant to the charge and are inflammatory and prejudicial.... [T]his is a most 'exacting standard.'" *United States v. Huppert*, 917 F.2d 507, 511 (11th Cir. 1990) (quoting 1 Charles A. Wright, *Federal Practice and Procedure* § 127 at 424–29 (1982)). Therefore, it is proper to reserve ruling on a motion to strike surplusage until the trial court has heard evidence that will establish the relevance of the allegedly surplus language, as indeed the district court did in this case. *See, e.g., United States v. Fahey*, 769 F.2d 829, 842 (1st Cir.1985) (After hearing evidence, the trial court refused to strike certain alleged surplusage from the indictment.). Pending its ruling, however, the district court carefully prevented the jury from being prejudiced by the challenged allegations by providing the jury with only a summary of the indictment that did not include references to the Kalish and Weisner overt acts. R134:122.

█ Second, because there are no severance or surplusage issues relating to Noriega, the only real issue concerning Noriega is whether the district court abused its discretion in admitting references to Noriega during voir dire and the trial. *See Russell*, 703 F.2d at 1249. Evidence revealed, however, that the confidentiality of bank accounts at BCCI–Panama, crucial to the drug traffickers, was threatened when the United States Senate began to investigate Noriega's and BCCI's involvement in money laundering. What effect the investigation and Noriega's fall from power would have on the confidentiality of those accounts were topics raised *by the defendants* with the undercover agents.[15] Thus,

---

15. For example, on September 9, 1988, in a discussion about the Senate investigation into BCCI–Panama, Awan told Agent Mazur:

(AA): If they try to pull those records out of there, our branches are going to be closed

the references to Noriega were an "integral and natural part of an account of the crime," *United States v. Williford,* 764 F.2d 1493, 1499 (11th Cir.1985), and admissible to prove why the conspirators acted as they did in their dealings with the Panamanian bank accounts. Accordingly, it was not an abuse of discretion to admit the references to Noriega and his impact on the Panamanian banking system.

### C. *Pre–Trial Publicity*

The appellants assert that extensive pretrial publicity about the American invasion of Panama and the arrest of Manuel Noriega created a presumption that an impartial jury could not be selected, that the district court's voir dire failed to mitigate against prejudice, and that the appellants were actually prejudiced by four jurors who had formed opinions before the trial began as to Noriega's guilt. The record, however, does not support that the atmosphere surrounding the trial was presumptively prejudicial or that the voir dire was constitutionally inadequate.

Less than one month before trial, on December 15, 1989, General Noriega declared war on the United States. On the night of December 19th, three days after a member of the Panamanian Defense Force killed a United States Marine, the United States invaded Panama. American forces successfully conducted military operations as Noriega escaped into hiding. After receiving temporary asylum from the Catholic Church, Noriega surrendered to United States authorities on January 3, 1990. News agencies from throughout the world covered these events. Jury selection in this case began days later on January 16, 1990.

There are two ways in which pretrial publicity can give rise to a due process violation: (1) where prejudice is presumed because the publicity was "sufficiently prejudicial and inflammatory and [it] ... saturated the community where the trial was held," *Cummings v. Dugger,* 862 F.2d 1504, 1511 (11th Cir.), *cert. denied,* 490 U.S. 1111, 109 S.Ct. 3169, 104 L.Ed.2d 1031 (1989), or where the defendant establishes actual prejudice resulting from the publicity, *Coleman v. Kemp,* 778 F.2d 1487, 1490–91, 1541 (11th Cir.1985), *cert. denied,* 476 U.S. 1164, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986).

█ The presumptive prejudice standard, recognized in *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) (defendant's videotaped confession aired over a local television station to over two-thirds of a small community), is "reserved for extreme situations where pretrial publicity renders 'virtually impossible a fair trial by an impartial jury drawn from the community.'" *United States v. De La Vega,* 913 F.2d 861, 865 (11th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2011,

down there and everybody is going to be under arrest in Panama.
(RM): Oh.
(AA): I mean the Panamanians are not going to stand for any records ... because if the records are produced, it's going to come out in the paper.
(RM): Right.
(AA): You know. They're basically trying to get Noriega.
(GE 508B at 9–10).
(RM): But it would take, I would think it would take a massive effort. There must be so many accounts and so much, what would they really know to look for?
(AA): There must be thousands. I don't know what they'd know to look for, but if anything gets released there that BCCI is being investigated, BCCI is dead.
*Id.* at 11.
(RM): Why do think they're focusing on you though? Because of Noriega or ... yeah.

(AA): I happen to be the only person in the bank who knows all about Noriega's, uh, accounts and business.... And I've told [the U.S. Senate], "I'm willing to ... tell you whatever you want to know," because I think [Noriega] ah, he can get away. But I said, "I want ... to make a deal with you, that whatever I say should be in executive session, and not in open session." So, whatever I say, is "in camera". The reason being that if [I] say anything about Noriega and it's reported by the press, I'm dead. He's gonna kill me.
*Id.* at 15–16; *see also* (GE 181B at 19) (Awan advises Agent Mazur to curtail his transactions through Panama because of press about "the Noriega indictment."); (GE 195B at 5–6; GE 196B at 14–15) (Awan explains to Agent Mazur the potential impact of developments concerning Noriega upon banking secrecy in Panama.); R91:34 (Awan explains to Agent Mazur that if Noriega is overthrown, BCCI could lose its license if it's found backdating records.).

114 L.Ed.2d 99 *and cert. denied,* —— U.S. ——, 111 S.Ct. 2012, 114 L.Ed.2d 99 (1991) (quoting *Mayola v. Alabama,* 623 F.2d 992, 997 (5th Cir.1980), *cert. denied,* 451 U.S. 913, 101 S.Ct. 1986, 68 L.Ed.2d 303 (1981)). The defendants carry a heavy burden of showing such a virtual impossibility, *Coleman,* 778 F.2d at 1537, and in this case have failed to do so. Although the appellants introduced into evidence numerous news articles and media reports concerning Noriega's activities, including reports prior to the invasion linking Noriega to BCCI and Awan,[16] the record does not demonstrate that any juror who deliberated on this case had formed an opinion about the guilt or innocence of the *defendants* before the trial began. The appellants have not cited, and we have not located, any case where presumptive prejudice was found to result from peripheral matters not directly related to the defendant's guilt. In neither of the two cases cited by the appellants for the proposition that prejudice may occur from publicity about events indirectly connected with the matter on trial did the court presume prejudice; both courts merely treated the publicity as potentially prejudicial. *See United States v. Malsom,* 779 F.2d 1228, 1240–41 (7th Cir.1985) (The court considered the prejudicial effects of publicity relating to Libyan military activities on the trial of defendants charged with illegally exporting arms to Libya.); *United States v. Bangert,* 645 F.2d 1297, 1305–06 (8th Cir.), *cert. denied,* 454 U.S. 860, 102 S.Ct. 314, 70 L.Ed.2d 158 (1981) (The court considered the prejudicial effects of news coverage of the hostages in Iran on defendants charged with stealing an American flag during a pro-Iranian demonstration.). In both cases, jury voir dire and instructions were deemed sufficient to protect against juror prejudice.

Nor do we find that the district court's "group voir dire" resulted in any actual prejudice. As we noted in *De La Vega,* "[a] finding of actual prejudice requires the appellants to demonstrate that one or more jurors entertained an opinion before the trial that *the defendants* were guilty and show that these jurors could not put this prejudice aside and render a verdict based solely on the evidence presented." 913 F.2d at 864–65 (emphasis added). Of the twelve jurors who deliberated in this case, only six had heard anything about the case against the defendants, and they could not recall details of the news reports and had not formed any opinion about their guilt. *See* R36:74–75; R37:156, 157, 170; R37:35; R38:113–14. When one of the jurors, Ms. Wilkerson,[17] indicated that she had formed an opinion about the guilt *of Noriega,* the district court questioned her individually. R38:19–20. She indicated that she could disregard her opinion and be fair, and that she would not impute guilt to the defendants by association. *Id.* Given our deference to a trial judge's decision regarding the partiality of an individual juror, *Cummings,* 862 F.2d at 1510, Ms. Wilkerson's response was sufficient to justify the district court's determination that she need not be excused for cause. *See Bundy v. Dugger,* 850 F.2d 1402, 1426–27 (11th Cir.1988) (affirming refusal to excuse for cause a juror who had formed a negative opinion about the defendant but who could nonetheless be fair and impartial), *cert. denied,* 488 U.S. 1034, 109 S.Ct. 849, 102 L.Ed.2d 980 (1989).

### D. *Agent Mazur's Opinion Testimony*

The appellants contend that the district court erred by allowing Agent Mazur to interpret certain tape-recorded conversations in violation of Rule 701 of the Federal

---

16. *See* R11:480–Exhibits (Janice Castro, *The Cash Cleaners: A Major Bank is Indicted for Running a Global Drug–Money Network,* Time, Oct. 24, 1988, at 65–66 (discussing Noriega link)); (Bentley Orrick, Tom Brennan, *Noriega's Personal Banker Pleads Not Guilty,* The Tampa Tribune, Oct. 20, 1988, at A1); (David Finkel, Jean Heller, Milo Geyelin, *Noriega Linked to Indicted Bank,* The St. Petersburg Times, Oct.

13, 1988 at A1 (describing Awan's role as Noriega's personal banker)).

17. The record does not identify Jurors Donaldson, O'Brien, and Ponessa as having formed opinions about Noriega's guilt as the appellants claim.

Rules of Evidence.[18] They note that the issue at trial was not whether they engaged in financial transactions on behalf of "Robert Musella," but whether they did so knowing that they were laundering drug proceeds. They contend that the only evidence relative to their state of mind were transcripts of undercover conversations and Agent Mazur's lay opinion testimony explaining those conversations. The appellants assert that Agent Mazur frequently interpreted dialogue that was not in code or otherwise complex to establish criminal intent, in the face of no other independent evidence to that effect. We review the district court's admission of opinion evidence for abuse of discretion. *United States v. Davis*, 787 F.2d 1501, 1505 (11th Cir.), *cert. denied*, 479 U.S. 852, 107 S.Ct. 184, 93 L.Ed.2d 118 (1986).

The appellants cite numerous examples of Agent Mazur's interpretative testimony that allegedly imputed knowledge and willfulness of criminal conduct to the defendants by recasting innocuous comments made by the defendants into admissions of money laundering. Brief for Appellant Bilgrami at 13–27. We note the following two examples put forth by the appellants:

Example 1:

[Bilgrami]: [I]t's very clear, I mean the law in the States is that if you're taking cash from a[n] ... individual, any of your offices ... then you have to advise the authorities immediately ... even if its five thousand dollars, if you have any inkling that the money is somewhat, uh, not clear ... that's with regard to cash. All the banks have an onus today ... to advise the authorities of that ... [b]ecause the environment has somewhat changed in the last two weeks ... generally there is a lot of, uh, laws coming out regarding this, so the environment is changing.

(GE 172B at 35–36).

Agent Mazur then testified that he understood Bilgrami to be conveying:

[The Witness]: That the law was being further defined in the United States and outside the United States as it related to handling the type of money that was coming from me and from my clients—*that being drug money.*

R88:77 (emphasis added). *See* Brief for Appellant Bilgrami at 16.

Example 2:

[Bilgrami]: [T]he bank has a policy.... A credit policy ... And that credit policy is defined by the management and the Board.... [W]e have certain seniority but we can be overruled ... and therefore ... support does not exist ... for any particular transaction. All transactions are taken on a case-by-case basis.... So ... I would say support never exists in any institution.... And, in fact, I would say that ... if you were to give too many details to ... superiors, they might ask us not to do it.... So, I would say that ... they are not aware of anything with you on these transactions. If they were, they might say no.... [T]he bank as a policy tends to shy away from these transactions, these type of transactions ... where ... the transactions are not very clear.

(GE 172B at 24–26).

When asked during direct examination what Bilgrami meant by transactions that were not "very clear," Agent Mazur responded:

[The Witness]: I took that to be his very cautious way of saying that they were *illegal ... [b]ecause of the source of the funds.*

R88:57 (emphasis added). *See* Brief for Appellant Bilgrami at 25.

The appellants assert that the above examples are representative of "hundreds" of instances during the two months of Agent Mazur's direct examination that he was permitted, over objection,[19] to offer

---

**18.** Fed.R.Evid. 701 states:

If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

**19.** Defense counsel objected to Agent Mazur's opinion testimony as repetitious and cumula-

subjective views about what straightforward comments in the tape-recorded conversations meant and why he and the defendants had uttered them. These explanations were especially prejudicial, they claim, in light of no other evidence establishing criminal intent. Thus, they conclude, the district court's admission of Agent Mazur's testimony constitutes reversible error under Rule 701 because it did not assist the jurors in reaching their own decisions about the meaning and import of those statements. We conclude otherwise.

Rule 701 allows "lay opinion testimony if the opinion is 'rationally based on the perception of the witness and [is] helpful to a clear understanding of his testimony or the determination of a fact in issue.' " *Davis*, 787 F.2d at 1505 (quoting Fed.R.Evid. 701). Where a witness' testimony is based upon his "perceptions of the conversations ... the accuracy of those perceptions [is] a question for the jury." *Id.* A witness may clarify conversations that are " 'abbreviated, composed with unfinished sentences and punctuated with ambiguous references to events that [were] clear only to the [defendant] and [the witness].' " *United States v. Theodoropoulos*, 866 F.2d 587, 592 (3d Cir.1989) (quoting *United States v. De Peri*, 778 F.2d 963, 977 (3d Cir.1985), *cert. denied*, 475 U.S. 1110, 106 S.Ct. 1518, 89 L.Ed.2d 916 *and cert. denied*, 476 U.S. 1159, 106 S.Ct. 2277, 90 L.Ed.2d 720 (1986)).

Here, the district court reasonably recognized that the lay jury in this case would likely be unfamiliar with the complexities of high finance and the intricate world of money laundering. For this reason, the district court allowed Agent Mazur to explain terms such as "haven countries," R82:25–27, and "shell corporations." R86:24–30. The district court also reasonably recognized the helpfulness to the jury of allowing Agent Mazur, "who was actually present and participating in the conversation and observing what was happening at the time in terms of gestures and the like of those who are speaking," R88:48, to explain phrases regarding international

transactions involving correspondent banks, numbered accounts, time deposits using collateralized loans, and how drug traffickers shield themselves from law enforcement. *See, e.g.*, R85:20–34; R87:68–72. All of these matters were central to the facts at issue and well within the ambit of Rule 701.

▮▮▮▮ Turning to the examples cited by the appellants above, we cannot say that it was reversible error for the district court to admit Agent Mazur's comments. In *Davis*, 787 F.2d at 1505, the district court admitted lay opinion testimony from two government witnesses as to the meaning of comments made by defendants who had been charged with drug trafficking. When the first government witness was asked what the phrase "you don't have to worry about" [the name of a certain defendant] meant, he responded that he thought that the named defendant must have known about the "dope business." *Id.* When the second government witness was asked what the phrase "wanted to make a trip" meant, he responded that he thought the defendant who uttered the phrase was referring to an "illegal act." *Id.* Although strongly cautioning that "the better practice might have been for the trial court to disallow [such] opinion testimony," we held that the district court did not abuse its discretion. *Id.*

Moreover, this case is distinguished from *United States v. Dicker*, 853 F.2d 1103 (3d Cir.1988), the case principally relied upon by the appellants. In *Dicker*, the Third Circuit held that an undercover customs agent should not have been allowed to interpret a defendant's potentially legitimate reference to munitions export certificates as "phony documents" when the reference was clear and straightforward. *Id.* at 1108–10. The Third Circuit also noted that the trial court did not " 'vigorously police[ ] the government's examination....' " *Id.* at 1109 (quoting *De Peri*, 778 F.2d at 968). In the instant case, however, most of the appellants' comments about wire transfers and banking regulations were not "perfect-

---

tive. *See* R83:66–68; R85:15. The district court cautioned the government to be "more selective" in its examination of Agent Mazur and permitted a continuing objection. R99:74–75.

ly clear" without Agent Mazur's explanations, *see id.* at 1110, nor did the district court fail to vigorously police the introduction of unwarranted interpretations. The district court repeatedly sustained objections to government questions where it determined that Agent Mazur's explanations entered into areas that were clear from the tape or clear from previous explanations about how financial transactions occurred. *See, e.g.,* R89:70; R92:17; R93:87; R95:25; R96:16; R97:11–12, 18; R102:47–50; R107:25, 123–24. Thus, we do not find reversible error.

## E. *Juror Misconduct*

The appellants argue that their right to an impartial jury under the Sixth Amendment was violated due to juror misconduct. They assert that because a juror attempted an extrinsic investigation of the facts during deliberations and told other jurors about his exploit before the verdict, and because the district court allegedly failed to make adequate inquiry of the jurors to eliminate the presumptive prejudice that arose, they are entitled to a new trial. We find that the district court's inquest into the misconduct and its denial of the defendants' motion for a new trial was not an abuse of discretion. *BankAtlantic v. Blythe Eastman Paine Webber, Inc.,* 955 F.2d 1467, 1472 (11th Cir.1992) ("The factual determination of whether consideration of extrinsic evidence caused the defendant prejudice is committed to the trial court's 'large discretion.'") (quoting *Marshall v. United States,* 360 U.S. 310, 312, 79 S.Ct. 1171, 1172–73, 3 L.Ed.2d 1250 (1959)).

Jury deliberations in this case commenced on July 20, 1990. Between 8:30 and 8:45 p.m. on the evening of July 24, 1990, FBI Security Complaint Assistant Al Smith received a telephone call from Mr. W.C. Donaldson, the husband of Juror Linda Donaldson. Mr. Donaldson informed Mr. Smith that his wife had told him that a juror, only known to her as "Skip," had extracted phone numbers from evidence in-

troduced at trial and had apparently used a WATS line to call those numbers. According to what Mr. Smith was told by Mr. Donaldson, in one call "Skip" had represented himself as a "friend" of Rudolf Armbrecht,[20] and the person on the other line had told "Skip" "not to call the number again and to destroy his records or notes regarding those phone numbers." R153:27. Mr. Donaldson also mentioned that "Skip" had told Juror Donaldson about his exploit "in front of other[ ]" jurors. *Id.* at 33.

That night after receiving the call from Mr. Donaldson, Mr. Smith notified his superiors who instructed him to contact the prosecution. The prosecution in turn contacted the presiding judge at his home, who issued instructions that Mr. Smith return Mr. Donaldson's call and advise him and his wife to no longer discuss the matter. The next morning, the district court suspended jury deliberations; and that afternoon questioned Mr. Smith *in camera* about the details of his conversation with Mr. Donaldson.

On the morning of July 26th, the district court ordered the courtroom closed, except for counsel, and conducted an individual voir dire of the jurors, beginning with Juror Robert "Skip" Spanczak. Juror Spanczak admitted that he had extracted a phone number from Armbrecht's personal telephone book, that he called the number from a pay phone and after being connected by an international operator to Colombia, asked the person on the other end if they knew Rudy Armbrecht, only to be told "no." He said that he then immediately hung up the phone. Juror Spanczak also testified that during lunch he later told several other jurors about what he did in passing, and that it was all only "simple curiosity" on his part. R154:20.

The district court then questioned Juror Donaldson, who testified that during lunch, Juror Spanczak declared "that he would do whatever it took to nail [Armbrecht]." *Id.* at 23. According to Juror Donaldson, Ju-

---

**20.** Armbrecht was tried jointly with the other defendants named in this appeal, but his appeal

was dismissed. *See infra* note 5.

ror Spanczak sat at the head of the lunch table and told her and five other jurors[21] that he had used an international WATS line at his daughter's place of employment to place several calls to Colombia, and had told whoever answered one call that he was a friend of Rudy Armbrecht's from the United States. She testified that she told Juror Spanczak at the time that she thought he was "nuts." *Id.* at 24.

The district court next questioned the other jurors who were present during the lunch, who all acknowledged hearing Juror Spanczak's comments. Jurors Anderson and Perez corroborated Juror Donaldson's testimony that Juror Spanczak mentioned more than one call and that he may have mentioned the city of Medellin, Colombia. Juror Perez also recalled that the Colombian speaker told Juror Spanczak to not "use this number." *Id.* at 34. Juror O'Brien recalled that someone in the group told Juror Spanczak that "he was crazy" for making the call. *Id.* at 30.

Following this initial round of questioning, the district court excused Juror Spanczak for cause under Rule 23(b) of the Federal Rules of Criminal Procedure, and sequestered the remaining eleven jurors. The court instructed Juror Spanczak as he left to not have any further "conversations or communications of any kind whatsoever with any other person concerning any aspect of this case" until the jury had completed its deliberations.[22] *Id.* at 60. The court then instructed the five jurors who had not heard about Juror Spanczak's telephone call not to consider Juror Spanczak's absence in determining their verdict. Next, the district court questioned for a

second time those jurors who had been at lunch with Juror Spanczak about whether they had recently heard any news coverage about the case[23] and if they could put the incident aside and render a fair verdict. Each juror stated that the incident was of little or no import and that they could proceed impartially.

Our review of these events is guided by the framework set forth in *United States v. Rowe*, 906 F.2d 654 (11th Cir.1990), "which determines whether Sixth Amendment fair trial rights are so violated by a jury's exposure to extraneous material or influence that a new trial is warranted." *Id.* at 656. A juror's consideration of extrinsic evidence requires a new trial "if the evidence poses a *reasonable possibility of prejudice* to the defendant." *Id.* (citing *United States v. Perkins*, 748 F.2d 1519, 1533 (11th Cir.1984)). It is the trial court's duty "to ensure that the jury verdict is in no way tainted by improper outside influences." *Id.* Moreover, the court must investigate

> the asserted impropriety upon merely a colorable showing of extrinsic influence. Subject only to Federal Rule of Evidence 606(b), the court may use whatever inquisitorial tools are necessary and appropriate to determine prejudice. If after this inquiry the court determines that the defendant met his burden of showing by a preponderance of the evidence the likelihood of jury prejudice, the burden shifts to the government to prove that the consideration of the extrinsic evidence was harmless.

*Id.* (citations omitted).

After examining the testimony regarding the extrinsic material introduced in this

---

**21.** Jurors O'Brien, Perez, Gilbert, Anderson, and Doster.

**22.** Juror Spanczak, however, completely ignored the district court's instructions and his own commitment under oath not to speak to the press while jury deliberations were in progress. On the day he was excused, he granted an interview to *The Tampa Tribune. See* R22:1108–Exhibit B (Doug Reardon, *Juror Said Call Was Just a Matter of Curiosity*, The Tampa Tribune, July 27, 1990, at 1A, 6A.).

**23.** Only two jurors noted hearing or reading any news report relating to the case since the com-

mencement of deliberations. Juror Richardson testified that she "heard something briefly on the [television] news this morning ... about one of the jurors playing investigator." R154:77–78. However, in response to the court's question regarding whether she could "continue serving fairly in this case," *id.* at 79, Juror Richardson responded, "I don't feel that it has affected my judgment of the matters at hand in any way." *Id.* Juror Gilbert noted that he saw the trial judge's picture on the front page of the July 26, 1990 edition of *The Tampa Tribune*, but that he did not look beyond the picture. *Id.* at 80.

case, the extent of the judicial inquiry, and the record as a whole, we cannot say that the extrinsic influence clearly "establish[es] the sort of prejudice meriting a new trial." *Id.* at 657. Upon learning about Juror Spanczak's actions, the district court immediately suspended the jury's deliberations. It then conducted a one-by-one voir dire of the members of the jury in a closed courtroom to lessen any possibility of intimidation. The court's questions carefully avoided those matters proscribed by Federal Rule of Evidence 606(b).[24] Of those jurors who were aware that Juror Spanczak called numbers listed in Armbrecht's phone book, none testified that they knew who answered the call or exactly what was said. The information that was provided did not raise any "inferences of guilt" that would serve to mandate a new trial. *See id.* Juror O'Brien testified that he believed that Juror Spanczak was told to "just hang up." R154:29. Juror Perez stated that Juror Spanczak had been told nothing more than, "don't use this number." R154:34. These comments simply do not suggest that either the speaker from Colombia or Armbrecht were connected with the Medellin cartel,[25] nor did the comments lend support to any of the charges pending against the defendants. The court then excused Juror Spanczak for cause, and ordered the sequestration of the jury to prevent any further infiltration of extraneous information. During a second round of voir dire, the court inquired into the jurors' exposure to media coverage and their ability to continue impartial deliberations. There was no evidence that any juror had digested any news report prejudicial to any of the defendants, *see, e.g., United States v. Bol-*

*inger,* 837 F.2d 436 (11th Cir.), *cert. denied,* 486 U.S. 1009, 108 S.Ct. 1737, 100 L.Ed.2d 200 (1988) (jurors exposed to newspaper article containing information that had been suppressed as evidence by trial judge), nor were the court's questions as to the juror's impartiality unduly leading or conclusory, *see United States v. Denno,* 313 F.2d 364, 373–73 (2d Cir.) (en banc), *cert. denied,* 372 U.S. 978, 83 S.Ct. 1112, 10 L.Ed.2d 143 (1963) ("[M]erely going through the form of obtaining jurors' assurances of impartiality is insufficient."). Only at the close of prudent and measured steps did the district court reasonably find a new trial unwarranted. R154:84.

### F. *Sufficiency of Evidence/Sibte Hassan*

Appellant Hassan asserts that there was insufficient evidence to convict him under 18 U.S.C. § 1956 because the evidence at trial failed to establish that he ever conspired to transport funds that were the proceeds of unlawful activity. Hassan was convicted of the conspiracy charged in Count 2, and for substantive transactions charged in Counts 16, 31, and 33. The government conceded at trial, R134:107, and again at oral argument, that there was little or no direct evidence showing that Hassan participated in or had knowledge of any financial transaction involving illegal proceeds. Instead, the government contends that Hassan's convictions are supported by a combination of: (1) circumstantial evidence of his membership in the charged conspiracy, and (2) the doctrine of co-conspirator liability upheld in *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946).[26] The sufficien-

---

**24.** Rule 606(b) states, in pertinent part:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.

**25.** The closest comment that might have raised such an inference was FBI employee Smith's testimony: Juror Spanczak told Juror Donaldson that the Colombian speaker told him to "destroy his records or notes regarding those phone numbers." Juror Donaldson conveyed this information to her husband, Mr. Donaldson, who in turn conveyed it to Mr. Smith. R153:27.

**26.** In *Pinkerton,* the Court held that a party to a continuing conspiracy may be responsible for substantive offenses committed by a co-conspirator in furtherance of the conspiracy, even though he did not participate in the substantive

cy of the evidence to support the jury's verdict as to Hassan thus stands or falls on the evidence to support his conspiracy conviction under Count 2. Unless the jury could reasonably have found that Hassan joined the conspiracy alleged in Count 2, it could not properly have held him accountable for the substantive offenses of his alleged co-conspirators.

Sufficiency of the evidence questions are to subject *de novo* review. *United States v. Beale*, 921 F.2d 1412, 1430 (11th Cir. 1991). Viewing the evidence in the light most favorable to the government, we must decide whether a reasonable trier of fact could have found Hassan guilty beyond a reasonable doubt. *United States v. Gonzalez*, 719 F.2d 1516, 1521 (11th Cir. 1983), *cert. denied*, 465 U.S. 1037, 104 S.Ct. 1312, 79 L.Ed.2d 710 (1984). "The test is identical whether the evidence is direct or circumstantial, and no distinction is to be made between the weight given to either direct or circumstantial evidence." *Id.* We must further decide whether there was substantial evidence to support the verdict, *United States v. Adames*, 878 F.2d 1374, 1375 (11th Cir.1989), drawing all reasonable inferences in favor of the jury's determination. *United States v. Martin*, 961 F.2d 161, 163 (11th Cir.1992). After carefully applying this standard, we reverse Hassan's conviction.

■ A conspiracy conviction cannot be sustained unless there is proof of "1) an agreement to commit an unlawful act and 2) an overt act by one of the conspirators in furtherance of the conspiracy." *United States v. Parker*, 839 F.2d 1473, 1477 (11th Cir.1988). The record is silent as to any express agreement between Hassan and the other defendants to launder illegal proceeds. Conspiracy, however, " 'may be inferred from the actions of the actors or by the circumstantial evidence of a scheme.' " *Id.* at 1478 (quoting *United States v. Cole*,

offenses or have any knowledge of them. 328 U.S. at 645–48, 66 S.Ct. at 1183–85; *see United States v. Edmond*, 924 F.2d 261, 268–71 (D.C.Cir. 1991) (reversing district court's ruling barring the government from using *Pinkerton* theory because it was not set forth in the face of the indictment).

755 F.2d 748, 755 (11th Cir.1985) ). The government contends that there is "[d]irect evidence from the undercover agents as well as tape recordings of statements of Hassan's co-conspirators within BCCI [that tie] him to the conspiracy." Brief for Appellee at 152. However, a careful review of this evidence does not reveal or tend to reveal that Hassan knew that the funds involved in the transactions represented the proceeds of unlawful activity—the essential aspect of the conspiracy charge. *See Parker*, 839 F.2d at 1478 ("Without evidence showing or tending to show a meeting of the minds to commit an unlawful act, [conspiracy] convictions cannot stand.").

The government's argument rests upon the following eight factual assertions:[27]

1. *Awan recommended that the undercover agents work through Paris, where Hassan was employed.*

This assertion is innocuous at best. Presumably numerous other people also were employed at BCCI–Paris, perhaps over 200 people worked at the site, Brief for Appellant Hassan at 2,[28] and Awan's referral made no mention of Hassan. Moreover, we find no reference in the record that Awan even knew who Hassan was at the time of the recommendation.

2. *This referral was made with Awan's guarantee that he would only refer Agent Mazur to "such people that ... [he] will be able to communicate with much easier."*

In support of this assertion, the government cites to Government Exhibit 282B at page 40, where Awan's guarantee can be found. However, the government failed to complete Awan's remarks. He went on to say, "which is why I referred you to Chinoy and Howard in Paris and Baakza in London." (GE 282B at 40). The citation makes no suggestion of Hassan's participation.

27. Brief for Appellee at 152–53.

28. We note, however, no reference in the record as to this figure.

3. *Awan and Bilgrami further repeatedly assured Agent Mazur that anyone to whom they referred Agent Mazur within BCCI was within the group knowledgeable about dealings with Agent Mazur, dealings that involved drug proceeds.*

This assertion simply builds on the flawed premises noted above. The record does not indicate that anyone referred the undercover agents to Hassan. Indeed, Agent Abreu testified that he did not know that Hassan even worked in Paris prior to his arrival there. R52:13.

4. *In Paris, Agent Mazur met Awan's good friend, Chinoy. When Agent Mazur told Chinoy that Agent Mazur's clients were drug dealers ... Chinoy then assigned Hassan to handle Agent Mazur's Paris account.*

The record indicates that Hassan was one of four different people at BCCI–Paris assigned to work on Agent Mazur's accounts, (GE 283B at 5–6), and that Chinoy made these assignments *before* Agent Mazur revealed to Chinoy the illicit nature of the funds. *See id.* at 72.

5. *Agent Abreu told Hassan directly that he and Mora were counterparts— that is, in Colombia Mora "handl[d] a lot of money from proceeds from narcotics ... especially cocaine" as Agent Abreu claimed to do in the United States. Hassan expressed no surprise at the revelation that Agent Mazur's right-hand man, Agent Abreu, handled drug proceeds.*

Although Agent Abreu indeed referred to himself as Mora's "counterpart" in his conversation with Hassan, nowhere in the record does Agent Abreu claim that he handled drug proceeds in the United States. In fact, Agent Abreu testified that he did not on any occasion tell Hassan that any of the funds deposited in BCCI by the agents or anyone else were drug related. *See* R52:44, 56, 66–67; R56:45–46, 52. Nor does the government cite to any evidence that Hassan was aware that Agent Abreu was Agent Mazur's "right-hand man."

6. *Hassan later attended a meeting between co-defendant Howard, Hassan's superior at BCCI Paris, and Agent Mazur. They agreed on codes to be used to discuss financial transactions over the telephone.*

The record clearly indicates that although such a meeting occurred at the BCCI–Paris office, Hassan left the meeting *before* Agent Mazur and Howard discussed the use of codes. (GE 297B at 7). Moreover, while Hassan was gone, Agent Mazur even suggested to Howard to keep the codes between them. *Id.* at 15 ("If you had sort of a code which just the two of us know about."). Hassan later returned to the meeting but there was no further reference to any use of codes.

7. *Hassan participated in the movement of drug proceeds between accounts as directed by Agent Mazur.*

Through the use of a footnote, the government bases this conclusory assertion on co-conspirator liability under *Pinkerton.* The government cites no evidence suggesting that Hassan agreed to participate in unlawful activity.

8. *Upon learning that Hassan was assigned to the Paris group dealing with Agent Mazur's drug proceeds, Awan did not express concern.*

The record shows that Agent Mazur returned from Europe and told Awan he had met Chinoy and Howard in Paris, as well as a "younger agent" named Hassan. Awan responded, "I don't know him personally, but I've spoken to him on the phone several times." (GE 351B at 2). We find nothing incriminating in this response.

There was simply insufficient evidence for a reasonable trier of fact to have found Hassan guilty beyond a reasonable doubt. Therefore, we REVERSE his conviction.

## III. CONCLUSION

The appellants have raised several other alleged errors. We have carefully considered the entire record and the applicable law pertaining to these issues and find them meritless.[29]

**29.** These issues include: (1) whether the indict-

ment sufficiently set forth the charged offenses

The conviction of Sibte Hassan is RE-VERSED and the convictions and sentences of the remaining appellants are AFFIRMED.

to place the defendants on notice of the charges against them; (2) whether the district court erred by denying without a hearing the defendants' claim that they were improperly targeted by the government's undercover investigation; (3) whether tape recordings of conversations between federal undercover agents and defendants in France were subject to suppression; (4) whether the district court had jurisdiction over those subparts of each transaction and transportation that occurred outside the United States; (5) whether the district court's voir dire removed the presumption of prejudice resulting from its failure to disclose the jury panel list; (6) whether the testimony of government witness Roberto Alcaino that was stricken at the close of the government's case caused undue prejudice; (7) whether the district court judge abused his discretion by denying the defendants' motion that he recuse himself; (8) whether the defendants' were denied a fair trial because of comments made by the prosecutor during rebuttal closing argument; (9) whether the district court's instructions regarding deliberate ignorance, willfulness, and theory of the defense were reversible error; (10) whether the sentencing guideline enhancements based upon the amount of money laundered violated the separation of powers doctrine or due process; (11) whether the district court was clearly erroneous in its finding that Awan and Bilgrami held supervisory roles in the money laundering conspiracy; and (12) whether the district court was clearly erroneous in its finding that Awan was financially able to pay a fine.